WALTERS SOUTHLAND INSTITUTE *v.* WALKER, TRUSTEE.

5-235                                           263 S. W. 2d 83

Opinion delivered December 21, 1953.

Rehearing denied January 18, 1954.

858

*Cracraft & Cracraft*, for appellant.

*Burke, Moore & Burke*, for appellee.

GEORGE ROSE SMITH, J. This is a suit brought by W. W. Matthews to foreclose a deed of trust executed by the appellant to D. G. Walker as trustee, securing notes totaling $7,847.60, and also to recover judgment upon an unsecured note for $6,001.40. The notes represent advances made by Matthews to the appellant, which is a school operated by the African Methodist Episcopal Zion Church. Matthews, as bishop of the Arkansas and North Carolina conferences of the church, was in charge of the school from 1936 until 1948. He asserts that during that period he advanced funds of his own in order to keep the Institute in operation. Upon a former appeal we summarized the appellant's defense in these words:

"While appellant in its answer and cross-complaint did not specifically deny the indebtedness to appellee, it alleged that the latter had sole active charge of the receipt and disbursement of all funds of the school from 1936 to 1948 and occupied the status of a trustee toward said institution; that during said years he controlled funds belonging to the school in excess of $120,000 without adequate records and a proper accounting thereof; that he caused the deed of trust and notes sued upon to be authorized at meetings of the board of trustees held without a quorum present and without approval of the Department of Christian Education as required by the discipline of the church; and that there were certain discrepancies in appellee's financial reports to the general conference and a failure to account for funds which the church records disclosed were delivered to him for the use and benefit of appellant. Appellant prayed for an accounting and that it be given credit upon any indebtedness found due appellee for all funds received by him belonging to appellant and not properly accounted for. By amendment to the cross-complaint it was also alleged that on account of the fiduciary relationship existing between the parties and the complicated accounting involved, a master should be appointed to take proof and state an account between the parties." 217 Ark. 602, 232 S. W. 2d 448, 450.

At the first trial the chancellor considered the proof too indefinite and confusing to justify a finding that the school was entitled to any setoff against the notes sued upon. We reversed that decree and directed that a master be appointed to state an account between the parties. In doing so we said: ''The fiduciary relation existing between the parties imposed upon appellee the duty to render a proper accounting of the funds handled by him particularly in matters in which he was personally interested.''

Upon remand the court named David Solomon, Jr., as its master and directed him to state an account between the parties. The master, in arriving at his conclusions, considered the testimony taken at the first trial, additional testimony presented to him, and the financial records of the school. His reports to the court reflect a most painstaking and conscientious study of the complex questions in the case.

Without going into unnecessary detail, we may say that the master's analysis boils down to two basic findings of fact. First, he determined that from 1936 to 1948 the school's receipts totaled $128,541.19 and its disbursements totaled $114,586.74. After adjustments were made to reconcile certain duplications and omissions, the net shortage was found to be $12,679.67. All but $3,447.24 of this apparent deficit was incurred in the three and a half years between December 1, 1938, and May 31, 1942, and was occasioned by the fact that the school's record of disbursements for those three and a half years could not be found. In short, the master found an actual shortage of $3,447.24 and an apparent shortage of an additional $9,232.43 that was attributable to the absence of disbursement records.

Second, the master found that during the twelve years in question Matthews advanced $19,253.50 of his own money to keep the Institute in operation. Thus the master's over-all conclusions were that Matthews' advances exceeded the shortage in the accounts either (a) by $15,806.26 if he were excused from responsibility for

the loss of the disbursement records, or (*b*) by $7,573.83 if he were held liable for the apparent 1938-1942 deficit. The chancellor adopted alternative (*a*), and since upon that basis the school owes Matthews more than the amount sued for, the decree granted the relief sought.

The appellant's principal contention is that the chancellor erred in not holding Matthews liable for the apparent deficit of $9,232.43 that is attributable to the lack of disbursement records for forty-two months. The argument is that Matthews was a fiduciary, that a fiduciary cannot delegate his duty to keep accounts, and that in the absence of complete records every presumption of fact is against the fiduciary. The opinion in *Red Bud Realty Co.* v. *South,* 96 Ark. 281, 131 S. W. 340, is cited to support this argument.

We do not agree that in this particular case the fiduciary's duty to keep accounts was not delegable. A trustee's duty is not to delegate the doing of those acts which he can reasonably be expected to perform personally. When the matter is one that can properly be delegated to an agent the trustee's duty is then that of properly supervising the agent's conduct. Rest., Trusts, § 171.

The law of trusts did not require Matthews himself to act as bookkeeper for the Institute of which he was president. The school had more than a hundred resident students, to be sheltered and fed. A staff of six or more teachers was maintained. Naturally enough there were many bills for groceries, utilities, repairs, salaries, etc., to be paid and recorded. At the same time Matthews' duties as bishop of two states required him to spend perhaps a third of his time in visiting the local churches under his jurisdiction. In these circumstances it was entirely proper for Matthews to entrust to his registrar the matter of keeping the Institute's books. The parent church organization had specified the bookkeeping system to be followed, and there is evidence that from time to time its representatives checked the accounts, without complaint. It goes without saying that substantial outlays were needed to operate the Institute for the three

and a half years in question. We do not feel that Matthews' inability to produce, some eight years later, the disbursement record for this period makes him liable for the entire operating expenses of the school for those forty-two months.

Furthermore, the preponderance of the testimony indicates that the loss of the records occurred after the books had left Matthews' control. Both he and the registrar testified that the accounts were complete when they were turned over to Bishop Jones in 1948. The matter was not mentioned when Jones appeared as a witness at the first trial, and he did not testify before the master. Not only does the appellee's evidence stand uncontradicted; it is logically credible. The bookkeeping system involved the use of two ledgers, one for receipts and the other for disbursements. For the forty-two months in controversy the record of receipts is available, but the disbursement ledger is missing. It is obvious that had the appellee desired to conceal the records of his stewardship he would not have preserved the damaging account of receipts while withholding the only ledger that was favorable to him, that of the school's expenditures. Since there was no conceivable reason for Matthews to do away with the disbursement record it is fair to assume that he turned it over to his successor.

The appellant's other contention is that the master was in error in finding that Matthews advanced $19,-253.50 of his own funds to the school. Of this amount, $11,923.74 is shown by the school's records to have been advanced and is not questioned by the appellant. Indeed, every witness having knowledge of the facts concedes that Matthews used substantial amounts of his own funds to keep the school in operation. But the remaining $7,-329.76 of Matthews' advances does not appear on the Institute's records; this figure represents the total amount of personal checks given directly by Matthews to various creditors of the school. Matthews did not take the stand to identify each check, and it is therefore contended that these outlays are not shown to have been necessary.

We think the master was right in finding that these advances were in fact made for the school's benefit. He appeared as a witness to explain his reports to the court, and in his testimony he states that from his study of the case the payees of the various checks "were all familiar names to me from other periods where transactions actually appeared on the ledger of the Institute, and entries in the ledger in the other periods were similar to these in the books." Our first opinion stressed particularly Matthews' duty to account as to matters in which he was personally interested, but the canceled checks relied upon by the master meet the standard of proof contemplated by our opinion. Considerably more than half of the amount now in dispute is represented by a check for $4,235, with which Matthews paid from his personal bank account the balance due on a mortgage to a fraternal organization. The master had reason to conclude that the other checks, for relatively small amounts, represented routine payments to local merchants, teachers, etc. There is no reason to suppose that Matthews' recollection of these details, as much as fifteen years after the events, would have added much weight to the persuasiveness of the checks themselves.

Affirmed.